We will now hear argument in Lawson v. Union County, Ms. Booth. Good morning, Your Honors, and may it please the Court, my name is Samantha Booth on behalf of Melanie Lawson who is actually in court with us today. The central question in this case is did Freddie Galt, the Union County Clerk of Court, have the right to retaliate against and terminate Melanie Lawson because she exercised her First Amendment right to run for public office and speak on matters of public concern and affiliate with a candidate of her choice? The answer is no. The Constitution tolerates this kind of substantial infringement on an employee's core First Amendment right only in two very narrow circumstances, both of which would require Galt to prove that firing Melanie Lawson was reasonably necessary to safeguard the government's interest in preventing a material impairment to its ability to provide services to the public. Galt cannot make this showing. First and foremost, the Elrod Bronte exception is an exception and a narrow one at that, and it is simply intended to safeguard, to recognize that there are these certain high-level employees for whom political affiliation is a reasonably appropriate requirement. How much more of a disruption can it be than to have someone who wants to take your job, run for office against you, remain in an office of 10, 11 employees? That seems pretty disruptive to me. Your Honor, the question is whether there is actual evidence that the office's ability to provide services would be impaired, and there is absolutely no evidence of that here. It is not self-evident from the fact that someone runs for office that that will actually cause disruption to the office's ability to provide government services. The Fifth Circuit in Jordan v. Ector and the Tenth Circuit in Kent v. Martin, in fact, both confronted circumstances in which deputy clerks had run against the county clerk and had actually remained in office while doing so, and even in those circumstances, the defendant was unable to come up with any actual concrete evidence of disruption in order to justify terminating the employee, and both circuits found that it violated... Why should that be a requirement in the context of someone who is running for office against her boss? It just seems to me that that does not implicate any free speech or associational rights, at least not to the extent that it requires that superior, that supervisor, to have to put up with having a subordinate who deigned to run against him, continue to work closely with him, be his right-hand person, his deputy clerk. I just don't see that that's something that the First Amendment should protect. Your Honor, the very core of the First Amendment is this idea that we need to safeguard our democratic system of self-governance and our political processes, and there is nothing more fundamental to that right than the right to run for office and to speak on matters of public concern. I think the question, though, assumed that. I think the question was a little bit more specific. And the question is, that right is not unabridged. It is subject to certain limitations, and I believe that the question framed some of those limitations, that Gault would have to work with someone who not only ran against him in a partisan political election, but also questioned his integrity. So, yes, Ms. Lawson ran against him, and yes, there are very narrow exceptions to the First Amendment right to engage in core political activity, but those exceptions don't apply here. My question really goes more factually. Do you dispute the premises underlying Judge Diaz's question, or my question, that in the context of this election, Ms. Lawson questioned Gault's handling of a personnel matter, of a hiring matter? Ms. Lawson asked a question. She asked where the funds were coming from to pay for Ms. Miller's salary. That's the undisputed fact. But when you question where the source of funds are coming from, doesn't that necessarily question the judgment of the hiring official there? The hiring official who is not only there, but the person who was hired is also there, whom Lawson referred to by name, whom she would have to work with. Is that not an adverse effect that's reasonably to be apprehended in the language of our president? Your Honor, both the circuit and the Supreme Court have repeatedly and routinely held that mere criticism is not enough. Pickering was about this very kind of criticism of a superior, so was Goldstein v. Chestnut Ridge Volunteer Fire Department. My question isn't about criticism. My question is about questioning the integrity of Gault and also, by name, an individual in this small office in which she would be coming to work. It is personal. It is not a generic criticism of the office. It's directed specifically to Gault and the woman who was hired in a manner that Lawson found questionable. Miller. I'm sorry. I am trying to answer your question. So, yes, the criticism was personal, but that personal criticism against a superior is still protected by the First Amendment. And the bare fact that there was this criticism is not enough. But it's not necessarily protected if it is likely to affect the work environment. That's what we said last year in Smith v. Gilchrist, isn't it? In Smith v. Gilchrist, and in many Supreme Court precedents, the question is whether there's actual concrete evidence that it's not. No, that isn't. The question is whether or not an adverse effect was reasonably to be apprehended. That's a quote from Gilchrist. Based on concrete evidence, though. It can't be based on just bare assertions of disruption or that someone's feelings might be hurt. Because criticism always causes those kinds of feelings or those kinds of tensions. It has to be based on some sort of actual concrete evidence from which it can be reasonably inferred that disruption will flow. But we have to remember here we're dealing with a very strong First Amendment right, and we need a very strong countervailing government interest on the other side. It can't be enough that we merely say it might have caused some tension, it might have hurt some people's feelings. That just can't be enough. Otherwise, Pickering would be meaningless. If the feelings of the officeholder is deemed to drive the question of whether there's a reasonable likelihood of disruption, then the officeholder will always be able to preclude a challenge from a deputy, correct? Correct. If the officeholder's feelings are hurt, and if we're going to weigh that as disruptive of the office's operations, maybe we should have a suck it up rule. You want to run for this office? You want to hold this office? Politics ain't being bad. I think that's exactly right, Your Honor. That's the point I'm trying to get at here. This principle has been enunciated over and over and over again in Pickering, in Smith v. Gilchrist, in Goldstein v. Chestnut Ridge Volunteer Fire Department, in Dalton v. Eiffelt, and in Riddpath. So this has been something that is well established in the circuit and in Supreme Court. Well, actually, there's no case, is there? Help me out. Is there a case that says categorically a subordinate can't run against his or her superior in a contested partisan context? In other words, is there a carve-out of the First Amendment to that effect, that categorically you can't run against your boss? Absolutely not, Your Honor. Is there any case that says you can run against your boss? There's cases that say you can engage in core protected First Amendment activity. Right, but is there a case that says you can run against your boss? In other words, I think the answer is no. There's no case that goes either way or the other on that specific question. Yes, if we frame that question that narrowly. But there are cases saying you can't be fired for campaign speech. Right. And that's exactly what we're dealing with here, in particular with respect to this comment about June Miller's salary that we were talking about. But what Judge Diaz was getting at is the understandable concern of an officeholder who has to run an office and who is confronted, actually Judge Diaz, Judge Duncan, as you just pointed out, what do you do about a person who not only runs against the boss, but raises a question that arguably touches on the boss's integrity? You would say that falls under the suck it up rule. I would say that the answer to critical speech is more speech. There's no reason why Mr. Galt couldn't have just answered the question if he was doing nothing wrong, which my understanding is he was not doing anything wrong. But that doesn't address what happens after the election is over and he has to then continue to operate his office with someone who challenged him and his integrity. He can respond, but that doesn't address, I mean, the reality is that the problem exists. Ms. Lawson was a veteran employee of the county clerk's office. She was an exemplary employee for over 21 years. They had a good relationship, Mr. Galt and Ms. Lawson had a very good relationship throughout the election. She called him the day after the election to congratulate him on his victory. They previously competed. He hired her. Right. He promoted her after they previously competed and she has demonstrated that she is not the type of vindictive employee that's going to come back in and is going to try and undermine. Is that what it turns on? I would just point out that the government bears the burden here and the government has to show that its interest is so vital here that it justifies substantially infringing on a very, very core political right. That's not quite the government's burden, is it? Indeed, under Pickering it is. In fact, in Jenkins, and let me back up just to clarify one thing, is it your view that we should analyze this under Pickering as opposed to Elrod Bronte? Your Honor, I think both apply here because we're dealing with both, excuse me, let me rephrase that. How would you have us analyze this? Sure. I think the core inquiry here is Pickering. I think you're right to focus on that issue. I think the Elrod Bronte exception does not apply here, though defense has tried to focus on that. But it's a very narrow exception that does not apply here, and so you're right that that line of questioning is not controlled. Ms. Booth, your light is… I realize that. Yes, and we have certainly asked a lot of questions, and you have reserved some time for rebuttal. Yes. I was just going to make a comment. As a corollary to Judge Davis' suck-it-up rule, maybe the rule should be if you deign to take on the king or queen, you better take him out. That rule has been specifically rejected, though. Specifically? If you could come back and give me that cite, I would love to see it. Well, I mean, letter of clearance was about this idea that we rejected the political patronage system. Thank you. Thank you very much. Mr. Ball? Your Honors, I'm here representing the common cause, the Brennan Center and the Pennsylvania Center for the First Amendment. And my client's interest here is in the effective functioning of the political process, which I think is very much implicated in cases such as this. When you've got a local office like this, the logical candidates that should be served up as an option for the voters would be people who are, first, local, and, second, have a great deal of experience in the job. They would quite – the most reasonable ones would be the deputies in that very office. So to the extent that the holder of this kind of local office, including one that is really fundamentally a ministerial office rather than a policymaking office, can essentially tell his employees, if you run against me and you lose, you're out of a job, that office holder will be able to undermine that kind of electoral competition. And the electoral – preservation of such competition is part of what the court said in Rule 10. Going to the pickering balance, it seems to us that this very much affects the weight to be placed in the pro-speech side of the pickering balance. The burden under pickering and, as the court recognized in Smith v. Gilchrist, is on the government to show that the risk of disruption is not merely present, not merely substantial and reasonably forecastable from the facts, but actually outweighs the value of the speech. Does it matter how the campaign is run? If it gets down and dirty and it's just mudslinging all the way around, attacks on integrity, on the incumbent, does he need to put up with that challenger if, in fact, he wins? Go ahead. I'm sorry, Your Honor. Under pickering, since it is a balancing test, a good deal can go on both sides of the balance. In principle, if there is specific evidence that suggests that because of this campaign, there maybe already has been tension in the office, say if a person has returned but now there's tension, or perhaps especially if impartial third-party observers, perhaps people who work or have worked in the office, have said, look, you know, knowing the offices we do, this is a real problem, then that might be relevant to the analysis. But all campaigns necessarily have some degree of disagreement. And as we see from many political campaigns, that's often much more than the disagreement here. Where's the fat law line here? Your Honor, the question of the pickering balance is generally a question of law, although I suppose there may be some subsidiary issues of fact that might be in certain situations left to the jury. So on the specific question of disruption, how close to a question of law, how close to a question of fact, and how do we tell the difference in a particular case? We would argue that if there is a factual tension about that, that is a- On the record here, or you mean generally? I'm sorry, Your Honor, I'll answer both. If there is a factual question, we think that could be something that would be quite suitable for a jury to at least ascertain the degree of that factual tension. On the record here, we do think that there is certainly some dispute here, but especially when the chief evidence is that the office holder says, oh, well, I can't work with this person. I think, Your Honor, your question suggested quite correctly that there ought to be some skepticism about that. If you have an incentive system where it's always in the office holder's interest to say, oh, I can't possibly work with this person because I interpret this particular statement as a serious challenge to my integrity, then I think even an honest office holder will be subtly pressured to even subconsciously manufacture these kinds of things. On the other hand, if the argument is we're not kings, you're not a king or a queen, you're a servant of the people who has to abide by the First Amendment, and you have to do as best you can to deal with the fact that there are competitive elections, and somebody offered herself as a candidate to the voters, and you ought to respect that unless it turns out really impossible to work with. The other thing, of course, is that the interest in disruption, the interest in the effective functioning of the office counsels in favor of having greater competition. It's true greater electoral competition can sometimes cause disruption in the office and make the office less effective. It can also make the office more effective because the office holder knows that he is ultimately accountable to the people. Incumbents have a very strong advantage in many ways. To what extent, if at all, does the fact that we're talking about that clerk of court here, which in certain sort of perhaps naive ways we'd like to think is a nonpolitical or at least nonpartisan kind of operation, does that matter? Your Honor, we think it matters very much for deciding whether, as the district court said, the Elrod Brantee exception applies here. We think it does not apply to the extent it may apply. It applies to policymaking employees, and here even the employer wasn't really a policymaker. As to the pickering balance, again, I think how are these campaigns going to be run? At least if they're run properly, they're run on the basis of who is going to be the more effective administrator in this very important task, not a policymaker. How does the fact that the clerk of court is a nonpartisan office, if in fact it is, then implicate any First Amendment concerns with respect to political belief or affiliation? If she is being fired simply because of her candidacy and you're talking about a nonpartisan office, then where is the First Amendment concern there? Your Honor, speech about elections and speech within elections is not a partisan office. Does that matter? Your Honor, that does not at all affect the First Amendment value of the speech. Many very important offices are nonpartisan. In many cities, city council offices and mayor offices are nonpartisan. I believe in my own city of Los Angeles that is so. Analytically, though, is that speech or candidacy, or do you view them as necessarily intertwined? Your Honor, we think they are very closely intertwined. Actually, in this case on the facts, they're intertwined just because the clerk of court actually gave two reasons for dismissing her. One is her running for office, and the other the specific statement she made to the campaign. Inevitably, the campaign will have particular statements in it. In fact, the clerk of court even mentioned that it wasn't just her running for office, but the message she sent by running for office, that some people thought he was not being effective. Christian Legal Society v. Martinez is actually possibly relevant on this point, simply because it shows that free speech and free association claims are treated the same way. I believe my time is up, Your Honors, unless you have further questions. Thank you. Mr. Bennis? Thank you, Your Honors. To please the Court, I'm Vance Bennis, and I represent Freddy Galt in his individual and official capacity. We have briefed all three issues, the issue on the merits of qualified immunity and 11th Amendment immunity, and I want to spend my time this morning talking about the issue of qualified immunity and 11th Amendment immunity. The elephant in the room, which nobody has mentioned today, is Bland v. Roberts, decided in 2013, which says that if an officer under state law serves at the pleasure of an elected official, if that official's alter ego, for whom he is liable for any neglect, and who has powers coterminous with the elected official, then the official may dismiss that employee for political disloyalty and for speech displaying that disloyalty. I did have a, actually, that goes to a question that I had about whether what is determinative is, you're correct that by statute, as I understand it, or by law, the deputy had the right to exercise, to carry out all the responsibilities of the principal, and that's what you're alluding to? Yes, that's correct. Does it matter that the employee, that the deputy did not actually carry out those responsibilities? In other words, what happens if there's a disconnect between the statutory grant of authority and the employee's actual day-to-day duties? Yes, ma'am. And the court has kind of spoken out of both sides of its mouth on that issue. Surely not. Originally, and still today, the court talks about it as the inherent duties of the position, not the duties of any particular officeholder that is controlling. But in Bland v. Roberts, the court talked about, well, you know, they've got powers of arrest, but the jailers don't actually arrest anybody. But the courts, so far as I'm aware, have always referred to position descriptions. The position description for the deputy clerk is in the statutes of South Carolina and in the case law of South Carolina, which says, we cited that 1918 case, which is very specific, that the deputy clerk can do all things that the clerk can do, whether in her own name or as deputy. And there is no distinction drawn in the statute, in the constitution, in the case law of South Carolina, between the deputy and the elected clerk of court. So we think here that there is no position description other than what the statutes and the law of South Carolina says, which is they are one in the same for all practical purposes. And Your Honor, I realize that Ms. Lawson contends that she was appointed deputy clerk for the family court, but there's only one commission, deputy clerk. And if you look in the record, she was commissioned a deputy clerk of court for Union County. She was assigned to the family court, but she was a deputy clerk of court. There's no deputy clerk of court for this, deputy clerk of court for that, recognized in the law. If you're commissioned as a deputy, you have all the powers and co-terminus with the clerk of court. We think in terms of qualified immunity that it's not sufficient to define the question at the level of does a public employee have the right not to be retaliated against for political activity. The question in this case is whether it was clearly established in November of 2012 that a public employee, who by state law served at the pleasure of and was the alter ego of his elected official principal with powers co-terminus with that principal, had a First Amendment right to run against his principal and retain her deputy slash alter ego position when she lost or after she lost. That is the question of qualified immunity. And we think that the Supreme Court has been reiterating repeatedly over the last few years that the matter has to be settled beyond debate to strip an official of qualified immunity. So may I unpack this? If there weren't that state court decision that you rely on, would your argument be exactly the same on the statute, based on the statute? Yeah, I think that the answer is yes, because the statute that permits the clerk to appoint deputies to serve at his pleasure and for whom he is responsible in all cases, simply what that case says is that statute, which existed at the time of the 1918 case, simply incorporated the common law, which South Carolina has adopted, except it's very varied by statute, of the deputy clerk's powers. Okay, so what is the significance of at the pleasure of? You've said that now about four or five times. What is the relevance of at the pleasure of? Well, we think that this court has twice mentioned at the pleasure of being important. One is in Stott v. Hayworth, where the court said that the fact that the legislature has made these positions exempt from civil service laws creates a presumption that they fall within the L. Rod Brantley exception. A rebuttable presumption. Excuse me? A rebuttable presumption. Of course, of course, a presumption. That's correct. And, Your Honor, more recently in Smith v. Fry, the court said, and this is a quote, Judge Fry's belief that the plaintiff supported her son's candidacy for circuit court clerk of court might have led Judge Fry to conclude that in a small office in which the plaintiff was working with the incumbent circuit clerk, the potential conflict of interest would hinder the efficient administration of justice in the judicial system. Judge Fry expressed those very concerns. In the context of at-will employment, such a belief is more than an adequate reason to dismiss an employee. So that's from Smith v. Fry, 488 Bed 3rd, 263 at 271. I believe Judge Duncan offered that opinion. And, again, Ms. Lawson has maintained that Mr. Goss has not offered a shred of evidence to support the claim that things were disrupted. Well, that's just simply naive. They're simply ignoring. Well, but your argument, see, I don't understand your argument to go to the Pickering issue. Correct. You should have won on a motion to dismiss. Correct. Your position is she has no claim under either South Carolina law or under federal law. That's correct. My position is that Bland v. Roberts is dispositive of this question. That's correct, Your Honor. And the reason is because your argument is that she's the alter ego of an elected official serving at that elected official's pleasure. And even though South Carolina has set up this First Amendment-infused electoral process, that doesn't matter. Well, and, Your Honor, that's correct with one additional qualification. She serves at his pleasure as his alter ego for whom he is legally responsible in all respect and with powers coterminous with his. Now, what does that mean? What does it mean he's legally responsible? If she runs over somebody in her car on the way to work, he's not going to have to pay for that. No, but if she embezzles money, Freddie Gough is responsible. In the performance of her duties. Correct. Correct. That's exactly correct. So your argument is that this is actually – well, you're arguing that it's Elrod Branty and that Elrod Branty is a matter of law because of the language of the statute describing her duties, which is the – that's your argument. That's right. Which is interesting because I thought you stood up and said you were going to focus on qualified immunity. Exactly. Well, I did. And it is my argument. And I simply think – my argument is that I have made that the argument on the merits. And that is my argument. And I'm simply saying that qualified immunity is an additional thing. Well, it's your backstop. It is my backstop. If we don't buy Elrod and then if we don't buy Pickering, then you win on qualified immunity. That's correct, Your Honor. Not entirely because qualified immunity does not exempt your client from prospective injunctive relief, right? Correct, Your Honor. And so I was going to address the Eleventh Amendment also. And I'm not trying to take up time unnecessarily, Your Honor. I understand a hint when I get one. But I don't know that I've gotten it yet. But my point in addressing qualified immunity is this court itself in the McGraw case analogized the dismissal of a chief deputy clerk of court for political activity to the dismissal of a deputy sheriff. So the court itself says in 1996, we would be remiss if we didn't extend the same prerogative to the clerk of court that we extend to the sheriff. And then that is the state of the law. And along comes Jenkins v. Medford, which says that if you have the alter ego, your conservative pleasure of an elected official, you can be discharged for campaigning against the elected official. Not running against, campaigning against for another person. And then along comes, Judge Blatt had a case in South Carolina involving a deputy who was dismissed by the elected clerk of Beaufort County. And Judge Blatt said, well, Jenkins v. Medford says if you're a deputy, you can be dismissed for political activity, political disloyalty. And by the way, the Court of Appeals said in McGraw that we look at this the same way we look at sheriff's cases. And who could sort out whether a clerk can dismiss a deputy? It's too complicated. We hold qualified immunity as appropriate. That's the state of the law when Freddie Galt dismissed Melanie Lawson. So extrapolating from that, at best, it can't be said that the law was clear going the other way. That's right. And to say that, you would have to say that the 11th Circuit, the old 5th Circuit, the 7th Circuit, the judges are all incompetent, knowingly violating the law. I mean, that can't be. The judges disagree on this question. It can't be that Freddie Galt held to a higher standard than they are. With respect to the 11th Amendment. We appreciate your vote of confidence. With respect to the 11th Amendment, I'd just like to point out that the plaintiff herself alleged in her amended complaint that Mr. Galt is a state official. Now, I realize that that's not determinative, but that's important, that she alleged that he is a state official. And in fact, she is correct. He is a state official. His office is established by the Constitution, the same article of the South Carolina Constitution that establishes the office of the sheriff, establishes the office of the clerk of court, the solicitor, and the coroner. And this court has held that a sheriff in South Carolina is the arm of the state. Cromer v. Brown. Cited Article 5, Section 24. State court precedent is clear that the clerk of court is a state official. The duties are prescribed by the General Assembly and added to by the Supreme Court, which says that the clerk of court has the control of the courthouse, which means that the clerk of court gets to decide what security is going to be in the courthouse, whether the county administrator can have his office in the county courthouse. Those are matters for political disagreement in South Carolina. But all the money comes from the county, right? There's no dispute that all the money comes from the county. No dispute that the money comes from the county, except that there's a state supplement appropriation. And so the concerns are he is involved with the court system, which in South Carolina is a unified court system statewide. So that is a statewide concern. And the other thing I would point out is that the 4th Circuit itself in Bright v. McClure, cited in our materials, said with respect to a North Carolina clerk of court, whose duties are set up by the Constitution as the same, said that he is clearly an arm of the state when he's sued in his official capacity. So we've got every district court in South Carolina that has considered the question has held that the clerk of the court is an arm of the state. The state Supreme Court has said that the clerk of court is a state official. The 4th Circuit has said that the North Carolina county clerks of court are state officials. Would it be fair to say that at this stage the official capacity claim is really an inconsequential? I mean, she doesn't want to work there anymore, does she? Well, she does. She wants money. She wants compensation for the wrongs done to her. And she wants to go back to work there. You think she really wants to go back to work there? She has asked for it. I understand she asked for it, but that was a couple of years ago. You really think she wants to go back to work there? I don't know whether she wants to go back to work or whether she wants to prove a point. But people have been known to seek their job back and then quit when the court ordered them entitled to their job back. I do not know that. But my point is simply that the clerk of court is an arm of the state. And so, if the court decides on the merits that Ms. Lawson is entitled to prevail, as the court decided in Bland v. Roberts that those deputies were entitled to prevail, that Mr. Galt would be entitled to qualified immunity due to the unsettled state of the law in his individual capacity and would be entitled to Eleventh Amendment immunity from damages to the extended student's official capacity because he's an arm of the state, which would only leave a claim for prospective instatement to her former position. By the way, when you say your qualified immunity argument rests on the lack of clarity in the law rather than – are you conceding arguendo that today she might have a claim? No, Your Honor. In fact – So you're arguing both prongs of qualified immunity? Yes, sir. Yes, sir. That she doesn't have a claim. That's correct. But in any event, at the time, his action, the law was unsettled. You're correct. And I would point out that one month, almost one month to the day before Ms. Lawson was terminated, the Eleventh Circuit decided under what – Well, we don't care about the Eleventh Circuit, do we? Well, some of us do. You can say that, Your Honor. They don't care about us. I care, Mr. Bettis. Thank you, Your Honor.  Your Honors, I'd like to make two points. First of all, Mr. Bettis focuses substantially on the supposed alter ego status of Ms. Lawson. Even assuming that the fact that under statute she can exercise the same duties as Mr. Galt, that is not relevant to the Pickering analysis unless – It's relevant to L. Rod Bronte. Right, but L. Rod Bronte does not apply here because if we look at the actual duties of both – No, you said when you were arguing, you said earlier that it could be analyzed under both. Right, except that L. Rod Bronte doesn't apply here because she's not a policymaker. My point is that the fact that – Yeah, could you finish your point about why it doesn't apply under Pickering? My point is that the fact that someone is the alter ego of an official is relevant only if that official himself exercises discretionary authority to which political partisanship is a reasonably appropriate requirement. If he doesn't exercise that kind of authority, then he cannot vest his deputy with that kind of authority, and thus the fact that the deputy could hypothetically step into his shoes is irrelevant because even if she did, she would not exercise the kind of discretion that makes her a policymaker. You're saying that he had no discretionary authority either? What about – didn't he set bail? If we look at the statute – in fact, he did not set bail. He had no discretion over matters to which – I'm sorry, setting bonds in criminal cases. Doesn't Carolina law vest the clerk with substantial authority with respect to setting bonds in criminal cases? In fact, if we look at the statute, Your Honor, it does not. It says that the judge sets bail and the clerk of court – Bonds. I'm sorry, I just didn't know that that was – I thought – okay. No, what happens on the ground is they stamp the paperwork. They're not exercising the kind of high-level discretionary authority. They're not judicial officers. Correct. It's the judge that's exercising that kind of discretionary authority. So you acknowledge that there's some discretion. You just think it's limited. Your Honor, I would submit that there is really not any discretion to the extent there is any nominal, nominal discretion that is not the kind of discretion we're talking about when we're trying to trigger this narrow Elrod Bronte exception. And, in fact, it has been held repeatedly in both the Supreme Court and in this circuit that supervisory authority, discretion with respect to nominal policymaking, is not enough to trigger the Elrod Bronte exception. That's what Akers v. Caperton held. That's what Fields v. Prater held. That's what McConnell v. Adams held. That's what Rankin v. McPherson held. That's what Elrod v. Burns held, and that's what Bronte v. Finkel held. All of those cases involved employees who exercised – for example, an assistant district attorney in Rankin v. McPherson's Supreme Court case. An assistant district attorney exercises some discretion, actually quite a bit of discretion, with respect to individual cases. But that's not the kind of discretion that's relevant here. The kind of discretion that's relevant here is this high level of discretion with respect to politically charged matters for which partisanship might be relevant, such as with the governor or the mayor. Can we go back for a moment? South Carolina law authorizes a clerk of court to refer cases to a master in equity or special referee for final disposition, order that under specified circumstances personal property be seized, suspend income withholding for spousal or child support in family court cases. In fact, if we look at the statutes – let's take the last example you just gave, suspend child support. If we look at what the statute actually says, it says that if the recipient of the child support cannot be found and that money cannot be given to that person – Okay, so you're saying it's so circumscribed it doesn't amount – It's so circumscribed. It's an objective criteria that are either met or they're not. There's no discretion. And to the extent there's discretion, it's certainly not the kind of discretion for which we need someone to have a particular political ideology. Only a Democrat can make this decision. That's just not the case here. And in fact, wasn't Mr. Galt and Ms. Miller, wasn't he a Republican and she a Democrat? That's true. And they worked together just fine. And the fact that the office was perfectly capable of functioning with members of various political ideologies – And by the way, he knew she was a Democrat when he rehired her. Correct. He knew she was a Democrat when he promoted her. That's why it was not reasonable for someone who knew that political affiliation was irrelevant in that office to believe that he could fire someone because of their political affiliation. He can't out of one side of his mouth say that it was irrelevant and the other side say that he thought it was a reasonably appropriate requirement. But counsel brought up the issue of sovereign immunity. And I did just want to make the point that – and it's an often overlooked procedural point. The Supreme Court in Lapidus v. Board of Regents of University System of Georgia held that when a defendant voluntarily removes a case to federal court, that waives 11th Amendment immunity. And that's just a procedural, automatic, by operation of law. Thus, in addition to the fact that under the RAMD data factors, it's very clear here that a South Carolina – regardless of what the case is in North Carolina, the fact that South Carolina deputies are clearly – But putting that aside, sovereign immunity has been waived here by the defendant's actions. Thank you very much. Thank you. We will come down and greet counsel and proceed directly to the next case.
judges: Allyson K. Duncan, Albert Diaz, Andre M. Davis